UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
RUDY FLEMING,                         : 12 Civ. 3053 (CM)(JCF)
                                      :
              Petitioner,             :   REPORT AND
                                      :   RECOMMENDATION
    - against -      MEMO ENDORSED     :
                                      :
SUPERINTENDENT PATRICK GRIFFIN,       :
                                      :
              Respondent.             :
- - - - - - - - - - - - - - - - - -:

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/16/13

TO THE HONORABLE COLLEEN McMAHON, U.S.D.J.:

    Rudy Fleming brings this petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, challenging his conviction following

a jury trial in New York State Supreme Court, New York County, for

one count of murder in the first degree (N.Y. Penal L. §

125.27(a)(vii)), two counts of robbery in the first degree (N.Y.

Penal L. §§ 160.15(1), (2)), four counts of attempted robbery in

the first degree (N.Y. Penal L. §§ 110, 160.15(2)), one count of

attempted robbery in the second degree (N.Y. Penal L. §§ 110,

160.10(1)), and one count of criminal possession of a weapon in the

second degree (N.Y. Penal L. § 265.03(2)).   Mr. Fleming was

sentenced to life imprisonment without the possibility of parole on

the count of first-degree murder and to lesser sentences on all of

the remaining counts.   (Sentencing Transcript ("Sent. Tr.") at A5:

2/28/2013 after reviewing Petitioner's objections, the Court finds them to be
without merit. The court accepts the Magistrate's well-reasoned
report and adopts the recommendations he proposes as its
conclusions of fact and law. The Petition is denied and the case
dismissed. As Petitioner has made no substantial showing of the denial
of a constitutional right there is no question of substance for appellate review —
no certificate of appealability will issue. I certify that an appeal from this order
would not be taken in good faith. 28 USC §1915(a).

448-97[1]).  He now contends that (1) his Fourteenth Amendment due process rights were violated when he was (a) denied a post-conviction competency hearing despite new evidence of mental illness and (b) denied assignment of a psychiatric expert to assist him raising doubts as to his competency at trial; and (2) his Sixth Amendment right to an impartial jury was denied because the prosecutor exercised peremptory challenges to strike three African American jurors on the basis of their race.  For the reasons that follow, I recommend that the petition be denied.

Background

A. The Crime and Arrest

On January 27, 2005, Nicole Dufresne was fatally shot on Manhattan's Lower East Side.  The shooting occurred during the robbery of Ms. Dufresne and three companions.  On January 30, 2005, the petitioner was arrested in connection with the killing.  (Trial Transcript ("Tr.") at A4: 419-20).  The indictment charged Mr. Fleming and his co-defendants[2] with 31 counts, including one count of first-degree murder, under a theory of intentional murder during

---

[1] The Appendix provided by the petitioner contains all the records referred to by both parties.  It is divided into seven separately paginated volumes.  I will refer to the respective volumes of the Appendix as "A1," "A2," "A3," "A4," "A5," "A6," and "A7," and utilize the page numbers in each volume provided by the petitioner.

[2] The petitioner's co-defendants were Ashley Evans, Servisio Simmon, and David Simmon.

the commission of a felony.  (N.Y. Penal. L. § 125.27(1)(a)(vii)).
The indictment also charged the petitioner and one co-defendant,
David Simmon, with a second crime that took place earlier on the
same night -- the attempted robbery of Adam Chavez.

Following his arrest, Mr. Fleming conversed rationally with
detectives about his pedigree and his supposed whereabouts on the
date of the murder.  (Competency Hearing Transcript dated Feb. 14-
17, 2005 ("Comp. Tr.") at A1: 259-61).   It was only when the
detectives confronted the petitioner with statements implicating
him in the murder that he began to act bizarrely -- stuffing paper
towels into his mouth, becoming "limp," and possibly pretending to
lose consciousness.  (Comp. Tr. at 261-63).

B.   Initial Hospitalization and Evaluation

While in custody at Anna M. Kross Center on Rikers Island
("AMKC"), Mr. Fleming reported having auditory hallucinations and
suicidal thoughts.  (Bellevue Hospital Center Discharge Summary
dated April 20, 2005 ("Discharge Sum.") at A2: 563).   He was
transferred to Bellevue Hospital Center's Forensic Psychiatry
Service on February 1, 2005, for evaluation and stabilization.
(Discharge Sum. at A2: 563).

At Bellevue, Dr. Jessica Pearson assessed Mr. Fleming eight
times between March 4, 2005, and March 21, 2005.   (Bellevue
Hospital Center Assessment Report of Dr. Jessica Pearson dated

3

April 6, 2005 ("Assessment Rep.") at A2: 472).  The petitioner's treatment team had requested a psychological assessment in order to clarify their diagnosis, and they asked specifically that the assessment differentiate between psychosis and malingering. (Assessment Rep. at A2: 472).  The six psychological tests performed on the petitioner showed that there was a strong possibility that he was exaggerating or feigning symptoms. (Assessment Rep. at A2: 475-76).  Dr. Pearson reported that Mr. Fleming answered cognitive and memory testing questions at random, that he displayed no evidence of thought disturbance, and that the psychotic symptoms he reported were greatly exaggerated. (Assessment Rep. at A2: 475-76).

Dr. Pearson concluded that it was "very unlikely" that Mr. Fleming had a psychotic disorder.  (Assessment Rep. at A2: 476). However, she noted that the petitioner has "fewer resources than most with which to cope" with a significant amount of situational stress and that he has "some deficits in cognitive functioning and expressive language." (Assessment Rep. at A2: 477).  She suggested that his "feigning of extreme psychiatric symptoms may be interpreted as an ill-advised attempt at coping with an extreme situation." (Assessment Rep. at A2: 477).  He was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct and was discharged on April 20, 2005. (Discharge Sum. at A2: 563,

4

566).

C.   Article 730 Examination and Hearing

On November 28, 2005, Supreme Court Justice Budd G. Goodman ordered a competency examination of Mr. Fleming pursuant to Article 730 of the New York Criminal Procedure Law ("CPL").   (Forensic Psychiatry Services Article 730 CPL Examination Reports ("Art. 730 Reps.") at A2: 572).

Dr. Steven Ciric and Dr. Pearson conducted the CPL § 730 examination of Mr. Fleming on December 30, 2005, at Bellevue Hospital Center.   (Comp. Tr. at A1: 15).[3]   At the interview, Mr. Fleming appeared disheveled, with tissues in his ears and lint in his hair, and he spoke haltingly and at low volume.   (Article 730 Report of Dr. Jessica Pearson dated Jan. 9, 2006 ("Pearson Art. 730 Rep.") at A2: 575-76; Article 730 Report of Dr. Steven Ciric dated Jan. 6, 2006 ("Ciric Art. 730 Rep.") at A2: 581).   After the examination, both doctors concluded that the petitioner was trying to appear that he suffered from severe psychosis and cognitive impairments, but that "there was no evidence he actually suffered those illnesses."   (Comp. Tr. at A1: 22-23, 118).   They reported

---

[3] Following Mr. Fleming's indictment, the court assigned Dr. Barry Rosenfeld, a psychiatrist, to assist the defense.   Notably, Dr. Rosenfeld did not testify at the competency hearing or submit any report to the court concerning Mr. Fleming's fitness to stand trial.

that Mr. Fleming was fit to proceed with his trial. (Pearson Art. 730 Rep. at A2: 573; Ciric Art. 730 Rep. at A2: 578). Their conclusion was corroborated by medical records showing that the petitioner's unusual behavior (shivering and speaking with a stutter) appeared to begin only when he was conscious that he was being watched. (Compt. Tr. at A1: 32, 48-49, 53-54, 62). For example, he was observed on multiple occasions speaking without a stutter while on the telephone. (Pearson Art. 730 Rep. at A2: 575; Comp. Tr. at A1: 48).

Mr. Fleming moved to controvert the findings of the report pursuant to CPL § 730.30(2), and a competency hearing commenced before Justice Daniel FitzGerald on February 14, 2005, and lasted four days. (Order dated March 23, 2005 at A2: 693). By decision and order dated March 23, 2006, Justice FitzGerald found that the petitioner was fit to proceed. (Order dated March 23, 2005 at A2: 693). Immediately prior to the start of the trial, the defense again moved for a CPL 730 examination, but the court denied the application.

D.    The Trial

Mr. Fleming was tried by jury with Justice FitzGerald presiding. Notably, the petitioner was removed from the courtroom before the jury selection began for physically struggling with court officers. (Tr. at A3: 3-5). He was brought into the

6

courtroom the next morning but was removed again for the same reason. (Tr. at A3: 27, 30-31). Thereafter, he did not again enter the courtroom during the trial or sentencing proceedings. Throughout the trial, he was unresponsive to defense counsel's request for his assistance with the trial defense. (Tr. at A3: 6, 26-27, 235-36; A4: 45, 99, 293; A5: 212-13).

### 1. Jury Selection

Jury selection began on September 25, 2006. In all, the prosecutor exercised eleven peremptory challenges, including three challenges to African American jurors. Defense counsel raised <u>Batson</u> claims with respect to these jurors -- Oscar Fambro, Patricia Muhammad, and Dawn Hairston -- claiming that the prosecutor's decision to strike them was racially motivated.

Mr. Fambro was "a little older than" defense counsel, was unmarried, had a daughter, had no criminal record or family members with prior arrests, and had previously served as a juror on a civil case that settled. (Voir Dire Transcript dated Sept. 26, 2006 ("Voir Dire Tr.") at A3: 124-25, 220, 229). He was employed on the support staff of the NAACP Legal Defense and Education Fund. (Voir Dire Tr. at A3: 124). He acknowledged that his work "would not make it difficult for [him] to be fair and impartial in this case." (Voir Dire Tr. A3: 98). When prompted to provide a race-neutral reason for striking Mr. Fambro, the prosecutor cited Mr. Fambro's

7

employment with an organization that "su[es] the government and [sues] police officers." (Voir Dire Tr. at A3: 126).

Ms. Muhammad was a college graduate and had been working for the YMCA on programming for transient residents. (Voir Dire Tr. at A3: 146, 184-86). She had previously served as a juror on a narcotics case. (Voir Dire Tr. at A3: 146). She had a brother who had been murdered two years earlier (Voir Dire Tr. at A3: 146), and a sister who had fallen to her death while attempting to flee from police officers (Voir Dire Tr. at A3: 161-63). The prosecutor asserted three race-neutral reasons for striking Ms. Muhammad: (1) she had experienced the death of a sibling, possibly as a result of police error (Voir Dire Tr. at A3: 225); (2) she had "someone murdered that upset her" (Voir Dire Tr. at A3: 224); and (3) she "mumble[d] to herself often in an audible fashion when questions were asked to other people" (Voir Dire Tr. at A3: 225-26).

Ms. Hairston was unemployed, though she had worked for the previous five years as a "medical biller." (Voir Dire Tr. at A3: 147-48). She had some college education, had two daughters, and had been a juror four years earlier on a criminal case. (Voir Dire Tr. at A3: 148). Her brother, who was imprisoned at the time, had prior drug-related arrests and had been acquitted after being charged with assaulting a police officer. (Voir Dire Tr. at A3: 148-49, 151). A few years earlier, her grandmother was murdered.

8

(Voir Dire Tr. at A3: 150).  The prosecutor proffered two reasons
for striking her: (1) the case may be too "emotional" for her
because of her grandmother's recent murder; and (2) her brother had
been falsely accused of assaulting a police officer and had an
extensive criminal record.  (Voir Dire Tr. at A3: 226-27).

The court denied defense counsel's <u>Batson</u> challenges with
respect to all three strikes, stating that the proffered reasons
were "race neutral and not pretextual."  (Voir Dire Tr. at A3: 128,
231)

### 2.   Verdict and Sentencing

On October 12, 2006, the jury found the petitioner guilty of
all counts. (Tr. at A5: 442-44).   Prior to sentencing, Justice
FitzGerald granted defense counsel's request for an additional
competency examination.  (Tr. at A5: 400).  Once again, the court-
appointed psychiatrists concluded that the petitioner was fit to
proceed.  (Pre-Sentencing Competency Reports dated Nov. 9, 2006,
and Nov. 13, 2006 ("Pre-Sent. Comp. Reps.") at A2: 694-703).
Defense counsel did not contest the results of those reports.
(Sent. Tr. at A5: 451).  On December 11, 2006, the petitioner was
sentenced.

### E.   Post-Trial Proceedings

#### 1.   May 25, 2007 to August 8, 2008 Hospitalization

On May 25, 2007, Mr. Fleming was involuntarily committed to

Central New York Psychiatric Center ("CNYPC") by court order. (Order dated June 21, 2007 at A6: 274). The medical records from CNYPC indicate that he exhibited psychotic symptoms and received numerous medications. (Central New York Psychiatric Center Record dated May 25, 2007 to Oct. 21, 2007 at A6: 31-276; Central New York Psychiatric Center Record dated Oct. 21, 2007 to May 19, 2008 at A6: 278-472; Central New York Psychiatric Center Record dated May 19, 2008 to Aug. 8, 2008 at A6: 474-657). He was discharged on August 8, 2008, after more than a year of hospitalization. (Central New York Psychiatric Center Fact Sheet dated Aug. 13, 2008 at A6: 476). It was recommended that he be placed in an Intermediate Care Program at the correctional facility where he was incarcerated and housed in a unit separate from the general prison population. (Affirmation in Support of Motion Under CPL § 440 ("440 Memo.") at A6: 10; New York State Office of Mental Health Discharge Summary/SErvice Plan -- Part 1 dated Aug. 1, 2008 at A6: 479).

### 2. Post-Conviction Proceedings

#### a. Motion to Vacate

Based on new medical records from CNYPC, Mr. Fleming moved to vacate the judgment pursuant to CPL § 440.10(1)(e) and (h) on the ground that he had been incompetent to stand trial. In the alternative, he requested court appointment of a psychiatric expert

10

to evaluate the new evidence and represent him in a hearing on the motion.

Mr. Fleming's motion included a letter from Dr. Jean Berggren, who had recommended Mr. Fleming's involuntary commitment in May 2007, and had been his treating physician since his discharge from CNYPC.   (Letter of Jean Berggren dated Jan. 29, 2009 ("Berggren Letter") at A6: 693).   Dr. Berggren stated that, although she was not acquainted with Mr. Fleming at the time of his trial, "in view of the subsequent development of his psychotic illness, [she] cannot say beyond a reasonable doubt that his refusal to participate in his defense was not motivated by paranoid and/or delusional thinking."   (Berggren Letter at A6: 693).   She went on to note that the petitioner "has consistently been paranoid since January 2007 (per other psychiatrists' notes), and he had avoided speaking with other professionals because of this paranoia." (Berggren Letter at A6: 693).   She also stated that she "s[aw] no evidence that he [wa]s malingering or exaggerating his symptoms." (Berggren Letter at A6: 693-94).   She stated that "[p]atients who malinger almost universally 'recover' once the need to appear psychotic has passed, and Rudy Fleming, while able to adjust in a limited way in a highly structured environment, still has psychotic symptoms even on adequate doses of antipsychotic medication." (Berggren Letter at A6: 694).

In a decision and order dated May 26, 2009, Justice FitzGerald denied Mr. Fleming's motion without a hearing.  He found that none of the evidence from CNYPC or the correctional facility where Mr. Fleming was incarcerated established that the petitioner was incompetent at that time of his trial.  (Opinion Denying Motion to Vacate ("Opinion") at A6: 706).  Justice FitzGerald noted that Dr. Berggren could only speculate that Mr. Fleming could have been delusional at that time.  (Opinion at A6: 707).  This was not inconsistent with reports and testimony of Dr. Ciric and Dr. Pearson, who acknowledged that Mr. Fleming was mentally ill, but that, despite his illness, he was malingering and was fit to stand trial.  (Opinion at A6: 708-09).

### b.   State Appellate Proceedings

On appeal to the Appellate Division, First Department, the petitioner raised various challenges to his conviction, his sentence, and the court's post-conviction ruling.  As relevant here, he contended that (1) during voir dire, the prosecutor exercised three peremptory challenges in violation of Batson v. Kentucky, 476 U.S. 79 (1986) (Brief for Defendant-Appellant ("App. Memo.") at A7: 69-81); and (2) the court erred in denying his CPL § 440.10 motion without a hearing and without appointing a psychiatric expert to assist the defense in challenging the court's pretrial determination as to his fitness to stand trial (App. Memo.

12

at A7: 60-69).

On December 28, 2010, the Appellate Division affirmed the petitioner's conviction and the denial of his CPL § 440.10 motion. People v. Fleming, 79 A.D.3d 626, 913 N.Y.S.2d 221 (1st Dep't 2010). Regarding the competency claim, the court held that the petitioner's submissions in connection with the CPL § 440.10 motion "were insufficient to raise an issue as to whether [the petitioner] was incompetent at the time of trial," and that he had not demonstrated a need for the "assignment of a psychiatric expert to assist in presenting the motion." (Decision dated Dec. 28, 2010 ("Dec. 28 Decision") at A7: 229). Regarding the Batson claim, the court held that the record supported the trial judge's finding that the prosecutor's reasons for challenging the jurors were race neutral and non-pretextual. (Dec. 28 Decision at A7: 230). Mr. Fleming's application for leave to appeal to the New York Court of Appeals was denied. (Certificate Denying Leave dated Feb. 24, 2011 at A7: 243). He did not file a petition for a writ of certiorari to the United States Supreme Court.

c.   Habeas Petition

The petitioner now seeks a writ of habeas corpus, raising two claims. First, he contends that the Appellate Division "unreasonably" upheld the denial of his post-conviction motion for a competency hearing and the appointment of a psychiatric expert.

13

(Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus ("Pet. Memo.") at 64-76). Second, he contends that the Appellate Division erroneously upheld the trial judge's determination that the prosecutor's explanations for his use of peremptory challenges were non-pretextual. (Pet. Memo. at 77-90).

Discussion

A.  Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), for a claim that a state court has adjudicated on the merits, a federal court may grant a writ of habeas corpus to a state prisoner only where the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Federal law is "clearly established" when it is expressed in "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." Howes v. Fields, __ U.S. __, __, 132 S. Ct. 1181, 1187 (2012) (internal quotation marks omitted). When a petitioner raises an issue that the Supreme Court has not "squarely address[ed]" or "clear[ly] answer[ed]," habeas relief is simply

14

unavailable.  <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008).

A state court's decision is "contrary" to clearly established federal law when the state court "applies a rule that contradicts the governing law set forth in" a Supreme Court opinion or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  <u>William v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

A state court's decision is "unreasonable" when the decision is "more than incorrect or erroneous" and is "objectively unreasonable."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003).  It is a standard that is "difficult to meet"; habeas relief should be granted only where there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  <u>Harrington v. Richter</u>, __ U.S. __, __, 131 S. Ct. 770, 786 (2011).  Notwithstanding this deferential standard, federal courts must independently evaluate whether a constitutional violation has occurred.  <u>Wright v. West</u>, 505 U.S. 277, 305 (1992) (O'Connor, J., concurring in judgment) ("We have always held that federal courts, even on habeas, have an independent obligation to say what the law is.").

B.  <u>Competency Claim</u>

It is well-settled that "the conviction of an accused person

15

while he is legally incompetent violates due process, and that state procedures must be adequate to protect this right." Pate v. Robinson, 383 U.S. 375, 378 (1966) (internal citation omitted). The touchstone for competency to stand trial is: "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has rational as well as factual understanding of the proceedings against him." Dusky v. U.S., 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted). In Pate, 383 U.S. at 387, the Supreme Court interpreted the due process clause to require that a criminal defendant be afforded an adequate hearing on competency to stand trial whenever the trial judge becomes aware of a reason to question the fitness of the accused. See also Silverstein v. Henderson, 706 F.2d 361, 369 (2d Cir. 1983).

The Supreme Court, however, has not mandated any particular procedure to safeguard these due process rights. It has only required that the defendant have a "reasonable opportunity" to demonstrate that he is not competent to stand trial. See Medina v. California, 505 U.S. 437, 451 (1992); see also Bisnett v. Kelly, 221 F. Supp. 2d 373, 385 (E.D.N.Y. 2002) ("While due process does require that a defendant be afforded the opportunity to demonstrate that he is not competent, it does not mandate any particular procedures for resolving the issue.").

16

In New York, CPL Article 730 provides a procedural framework for assessing the mental capacity of criminal defendants to stand trial.  See People v. Lewis, 95 N.Y.2d 539, 543, 720 N.Y.S.2d 87, 89 (2000).  The statue, in part, mandates that the court order a competency examination "when it is of the opinion that the defendant may be an incapacitated person." CPL § 730.30(1).  When the court issues such an order, the defendant is evaluated by a qualified psychologist and psychiatrist, and a report of the examiners' findings are submitted to the court and parties.  CPL § 730.20(1), (5).  A hearing on the issue of competency must be held if a party requests it, or the court orders it sua sponte.  CPL § 730.30(2).  The Second Circuit has held that "New York law provides the procedural protection Pate requires." Silverstein, 706 F.2d at 367.

    1.    Initial Competency Determination

The petitioner does not challenge the adequacy of the Article 730 examinations or the trial court's competency determination. Such a claim would be unexhausted, as Mr. Fleming did not challenge these determinations on direct appeal.  See, e.g., King v. Cunningham, 442 F. Supp. 2d 171, 182 n.20 (S.D.N.Y. 2006). Moreover, the trial court's competency determinations are fact-based and, as such, are entitled to a presumption of correctness, see Demosthenes v. Baal, 495 U.S. 731, 735 (1990), rebutted only by

17

"clear and convincing evidence," 28 U.S.C. § 2254(e)(1).  There is
no such evidence here.   On the contrary, there was extensive
contemporary proof, largely unrebutted, that the petitioner was fit
to proceed, and there is no suggestion that the initial competency
hearing was procedurally deficient.   Furthermore, the petitioner
was granted a post-verdict psychiatric exam (Tr. at A5: 440), and
two experts again found him to be fit.  (Pre-Sent. Comp. Reps. at
A2: 696, 700; Sent. Tr. at A5: 451).

### 2.   Denial of Hearing

The petitioner claims that the Appellate Division unreasonably
applied the clearly-established due process standards as set forth
by Drope v. Missouri, 420 U.S. 162 (1975), and Pate, 383 U.S. 375,
in denying his post-judgment motion seeking a new hearing on
competency and the appointment of a psychiatric expert to assist in
developing the record. (Pet. Memo. at 2, 74-75).  He argues that
"the new mental health pictures that emerge[d] from [the]
petitioner's post-judgment psychiatric treatment" cast sufficient
doubt on a pre-judgment competency hearing to require a new
hearing.  (Pet. Memo. at 74-75).

However, the petitioner's reliance on Drope and Pate are
misplaced.   In both cases, the defendants were not given a
competency examination or a hearing before trial despite evidence
casting substantial doubt on the competency of each defendant.

18

Drope, 420 U.S. at 176; Pate, 383 U.S. at 385-86.   In each
instance, the Supreme Court held that the defendants should have
been given competency hearings before trial when there were
indications that they might not be competent.   Drope, 420 U.S. at
176-77; Pate, 383 U.S. at 385-86.   Here, the petitioner was given
a competency hearing before trial, and there is no controversy as
to the adequacy of the procedural protections afforded to him at
the hearing.

Drope and Pate simply did not address the question at hand:
whether a petitioner is entitled to a retroactive competency
hearing after trial, even when the trial judge had held a
competency hearing and made a competency determination prior to
trial.   Thus, there is no clearly established Supreme Court
precedent upon which Mr. Fleming could rely.   See Wright, 552 U.S.
at 125-26.

Finally, to the extent the petitioner relies on New York state
or United States Courts of Appeals cases, they are irrelevant, as
habeas review is concerned only with clearly established federal
law as expressed in the holding of a Supreme Court opinion.   See
Williams, 529 U.S. at 412.

The petitioner's contention that he was entitled to the
assistance of a court-appointed psychiatric expert is equally
unavailing.   There simply is no controlling Supreme Court holding

19

on point.  Although Mr. Fleming relies on <u>Ake v. Oklahoma</u>, 470 U.S.

68 (1985), <u>Ake</u> merely requires that an indigent defendant be given

access to a psychiatric expert when "his sanity at the time of the

offense" is an issue at trial or his "future dangerousness" is an

issue at capital sentencing proceeding.  <u>Id.</u> at 83, 86-87.  The

Second Circuit has recently observed that <u>Ake</u> does not apply where

the defendant's "competency to stand trial" is at issue.  <u>United

States v. Harper</u>, 421 F. App'x 108, 112 n.2 (2d Cir. 2011).

     C.   <u>Batson Claim</u>

The petitioner argues that the state court unreasonably denied

his <u>Batson</u> claim that the prosecutor exercised peremptory

challenges against three African American prospective jurors on the

basis of their race.  (Pet. Memo. at 77).  The United States

Constitution forbids a prosecutor from exercising peremptory

challenges in a racially-biased manner.  <u>See</u> <u>Batson v. Kentucky</u>,

476 U.S. 79, 84 (1986).  To determine whether a violation has

occurred, courts employ a three-step analysis:

> First, a defendant must make a prima facie showing that
> a peremptory challenge has been exercised on the basis of
> race[; s]econd, if that showing has been made, the
> prosecution must offer a race-neutral basis for striking
> the juror in question[; t]hird, in light of the parties'
> submissions, the trial court must determine whether the
> defendant has shown purposeful discrimination.

<u>Snyder v. Louisiana</u>, 552 U.S. 472, 476-77 (2008)(alternations in

original) (internal quotation marks omitted).

20

Only the third step of Batson analysis is at issue here.  That
step focuses on the persuasiveness of the race-neutral explanation
for the challenge.  See Hernandez v. New York, 500 U.S. 352, 365
(1991).  The explanation need not rise to the level justifying a
challenge for cause.  Batson, 476 U.S. at 97.  Rather, a "neutral
explanation" is simply "an explanation based on something other
than the race of the juror."  Hernandez, 500 U.S. at 360.  In
assessing the explanation, the trial court must make "a sensitive
inquiry into such circumstantial and direct evidence of intent as
may be available," weighing all relevant facts and circumstances,
and determining whether the race-neutral explanation constitutes
the actual ground for the challenge or is merely a pretext offered
in an effort to conceal a discriminatory intent.  Batson, 476 U.S.
at 93 (internal quotation marks omitted).  Although this analysis
involves an evaluation of "the persuasiveness of the justification
proffered by the prosecutor," the Supreme Court has repeatedly
stated that "the ultimate burden of persuasion regarding racial
motivation rests with, and never shifts from, the opponent of the
strike."  Rice v. Collins, 546 U.S. 333, 338 (2006) (internal
quotation marks omitted).

The standard for analyzing a Baston claim on collateral review
is even more deferential than the standard on direct appeal.  The
"AEDPA imposes a highly deferential standard for evaluating

21

state-court rulings and demands that state-court decisions be given the benefit of the doubt." Felkner v. Jackson, __ U.S. __, __, 131 S. Ct. 1305, 1307 (2011) (internal quotation marks omitted) (finding no basis for lower court to conclude trial court clearly erred in accepting prosecutor's proffered race-neutral reasons for striking two jurors). Even where "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, [] on habeas review that does not suffice to supersede the trial court's credibility determination." Rice, 546 U.S. at 341-42. Thus, a habeas petitioner may overcome the presumption of correctness attaching to state court fact-finding only by adducing clear and convincing evidence to the contrary. Id. at 338-39; 8 U.S.C. § 2254(e)(1).

### 1.  Oscar Fambro

During Mr. Fleming's trial, the prosecutor excluded Oscar Fambro from the jury because he was employed on the support staff of the NAACP Legal Defense and Education Fund, an organization that sometimes sues the police and the government.  A prospective juror's employment is a facially race-neutral reason for a peremptory challenge. See, e.g., United States v. Farhane, 634 F.3d 127, 157 (2d Cir. 2011); Messiah v. Duncan, 435 F.3d 186, 200 (2d Cir. 2006); Baker v. Bennett, 235 F. Supp. 2d 298, 312 (S.D.N.Y. 2002).  Here, the NAACP is a legal advocacy group that

22

regularly sues the police, prosecutors, and governmental entities for perceived racial bias. A number of those lawsuits have challenged police conduct, prosecutorial discretion, judicial practices, and state penal laws. See, e.g., United States v. Armstrong, 517 U.S. 456 (1996) (filed amicus brief on behalf of criminal defendants); Brown v. City of Oneonta, 221 F.3d 329 (2d Cir. 1999) (filed amicus brief on behalf of plaintiffs suing city); Davis v. City of New York, 10 Civ. 699 (S.D.N.Y.) (representing plaintiffs suing city); People v. Taylor, 9 N.Y.3d 129, 878 N.Y.S.2d 554 (N.Y. 2007) (filed amicus brief on behalf of criminal defendant).

Against this background, the petitioner has failed to establish that the state court was objectively unreasonable in accepting the prosecutor's rationale for striking Mr. Fambro. It was entirely plausible for the prosecutor to fear that Mr. Fambro's work environment predisposed him to sympathize with a criminal defendant. Indeed, the prosecutor also used a peremptory challenge to remove Laya Vural, a non-African American juror, who stated that her husband worked as an attorney for the New York Civil Liberties Union (Voir Dire Tr. at A3: 260, 293, 331). The trial judge thus reasonably credited the race-neutral reason proffered by the prosecutor with respect to Mr. Fambro.

### 2.   Patricia Muhammad

The prosecutor asserted three race-neutral reasons for his decision to strike Patricia Muhammad: (1) the death of her sister, possibly as a result of police misconduct; (2) her demeanor during the prosecutor's colloquy with a different prospective juror; and (3) the murder of her brother.   All three reasons were properly credited by the trial judge.

Ms. Muhammad related that when the police knocked on her sister's door, apparently to arrest her, she tried to climb out the window onto the fire escape, but fell to her death eight stories below.   Ms. Muhammad implied that the police acted rashly, stating that they "should not have rushed in like that," as her sister was "on medication" and known to be "a jumper."   (Voir Dire Tr. at A3: 162-63).   While Ms. Muhammad did indicate that she could be "fair and impartial," the prosecutor had a legitimate reason to fear that she would not be impartial.   The prosecutor is "not required to accept the prospective juror's statement at face value." Cunningham, 21 A.D.3d at 748, 800 N.Y.S.2d at 552.

Ms. Muhammad's behavior during the colloquy with another prospective juror, Jacqueline Figueroa, was also problematic.   When the prosecutor inquired about the murder of Ms. Figueroa's brother, Ms. Figueroa commented that she did not think that it was fair that his 20-year-old homicide went unsolved.   Ms. Muhammad uttered, "Me

24

neither." (Voir Dire Tr. at A3: 185, 225). That Ms. Muhammad would interject such a comment raises a plausible fear concerning her impartiality. Indeed, the mere fact that she interjected during the colloquy provides a credible race-neutral reason for striking her. See Robinson v. Smith, No. 09 Civ. 8222, 2011 WL 1849093, at *16-17 (S.D.N.Y. May 17, 2011) (citing Second Circuit cases upholding peremptory challenges based on juror's demeanor). The prosecutor might legitimately fear that she would provide unwelcome commentary during the examination of trial witnesses as well.

The petitioner nevertheless argues that the trial judge never made a determination concerning this rationale. (Pet. Memo. at 89). However, the court did implicitly credit the prosecutor's reasons when it held that all of his arguments were "strong" and not pretextual. (Voir Dire Tr. at A3: 231, 248). Furthermore, the Supreme Court has recognized that "when the explanation for a peremptory challenge 'invoke[s] a juror's demeanor,' the trial judge's 'first hand observations' are of great importance." Thaler v. Hayes, __ U.S.__, __, 130 S. Ct. 1171, 1175 (2010) (alteration in original) (quoting Snyder, 552 U.S. at 477). Because "determination of credibility and demeanor lie peculiarly within a trial judge's province," deference to the trial court is required in the absence of exceptional circumstances. Snyder, 552 U.S. at 477. Here, there is no evidence sufficient to overturn the trial

25

judge's credibility finding. See, e.g., Sorto v. Herbert, 364 F. Supp. 2d 240, 249 (E.D.N.Y. 2004) ("[A] habeas court may apply the presumption of correctness to factual findings (including credibility determinations) that were not explicitly stated by the trial judge but could be inferred from his legal conclusion.").

Lastly, the prosecutor cited the murder of Ms. Muhammad's brother. As the petitioner argues, one might expect that a sibling's murder would make "a prospective juror "more prosecution oriented at a murder trial." (Pet. Memo. at 88-89). However, when considered in connection with Ms. Muhhamad's comments during Ms. Figueroa's colloquy, there was an indication that Ms. Muhammad may have harbored resentment against the government for failing to apprehend the murderer in her brother's case.

The three reasons proffered by the prosecutor, related and reinforced by one another, thus present a persuasive race-neutral explanation for striking Ms. Muhammad.

### 3.   Dawn Hairston

The prosecutor offered two reasons for striking Dawn Hairston: (1) he doubted her ability to serve as a juror because the case might be too "emotional" for her; and (2) her brother had drug-related convictions and had been falsely accused of assaulting a police officer. Both are credible race-neutral reasons for the challenge.

26

Ms. Hairston recounted that her grandmother was the victim of a "vicious" murder and stated that serving on the case might be "emotional" for her. (Voir Dire Tr. at A3: 148-49, 152, 212). She also doubted that she could handle viewing disturbing pictures such as the autopsy photographs of Ms. Dufresne that the prosecutor intended to offer at trial. (Voir Dire Tr. at A3: 152).

More importantly, the prosecutor had particular reason to be concerned about Ms. Hairston's emotions stemming from her grandmother's murder. She said that she did not feel that the police gave her family the attention and respect they deserved in investigating the crime. (Voir Dire Tr. at A3: 149-50). As in Ms. Muhammad's case, a prospective juror's "negative experience with law enforcement" is a legitimate race-neutral reason for her exclusion. Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2002).

In addition, Ms. Hairston's brother had been prosecuted for drug-related crimes and was imprisoned at the time. He had also been prosecuted, but acquitted at trial, for assaulting a police officer. When asked how she felt "the system handled [her brother's] cases" -- whether "fairly" or "not so fairly" -- she responded, "I love my brother, I'm partial. I mean if he did it and he served time, which he has, then he serve his time." (Voir Dire Tr. at A3: 149). Her equivocal answer, considered along with her statements regarding her grandmother's murder, created a

27

reasonable concern that she might harbor deep-seated mistrust of the government. See Owens v. Portuondo, No. 98 Civ. 6559, 1999 WL 378343, at *10 (S.D.N.Y. June 9, 1999) ("A family member's criminal history has been found to constitute a race-neutral factor for a peremptory challenge of a prospective juror.").

In sum, the trial judge was objectively reasonable in denying the petitioner's Batson motion. On appeal, the Appellate Division showed proper deference to the trial judge's credibility determinations. Furthermore, the petitioner has not identified any Supreme Court precedent contrary to the state courts' legal determinations. Nor has he proven by clear and convincing evidence that the factual premises underlying those legal determinations were erroneous.

Conclusion

For the foregoing reasons, I recommend that the petition for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Colleen McMahon, Room 1350, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.

Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE.

Dated: New York, New York
       January 10, 2013

Copies mailed this date:

Robert S. Dean, Esq.
Abigail Everett, Esq.
Center for Appellate Litigation
74 Trinity Place
New York, NY 10006

Martin J. Foncello, III, Esq.
Assistant District Attorney, Of Counsel
One Hogan Place
New York, NY 10013